# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| **GRUMPY CAT LIMITED,**<br>    Plaintiff,<br><br>vs.<br><br>**GRENADE BEVERAGE LLC, et al.,**<br>    Defendants.<br><br>**PAUL SANDFORD, et al.,**<br>    Counterclaimants,<br><br>vs.<br><br>**GRUMPY CAT LIMITED, et al,.**<br>    Counterdefendants. | Case No. SA CV 15-2063-DOC (DFMx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: CYBERSQUATTING AND DECLARATORY RELIEF FOR NON-INFRINGEMENT OF TRADEMARK AND COPYRIGHT** |

## I. **INTRODUCTION**

This case concerns Grumpy Cat, a viral Internet meme that transformed a house cat named Tardar Sauce into one of the most famous cats in the world. Complaint (Dkt. 1) ¶ 13. Plaintiff Grumpy Cat Limited ("Plaintiff"), owns intellectual property rights associated with Grumpy Cat, including a registered trademark and four registered copyrights. *See id.* ¶¶ 14, 15, 16. Plaintiff alleged that Defendant Grenade Beverage LLC ("Grenade") and its members, Defendants Nick and Paul Sandford—in creating and selling a ground coffee product—used the Grumpy Cat name and image beyond what was authorized in a licensing agreement (which Plaintiff alleged only authorized iced coffee products). *Id.* ¶ 2; *see generally* MSJ Order (Dkt. 92). Grenade defaulted, and Grumpy Beverage intervened and joined with the Sandfords (collectively, "Defendants") in filing a counterclaim. Counterclaim (Dkt. 39).

A jury trial in this matter was held on January 16–19 and 22, 2018. *See* Minutes (Dkts. 121, 122, 124–26). On January 22, 2018, a jury returned a verdict for Plaintiff, and against Grumpy Beverage and Paul Sandford. *See* Redacted Jury Verdict Form (Dkt. 131) at 1–7.

Under the December 18, 2017 Final Pretrial Conference Order (Dkt. 102), the parties agreed that the Court is to decide the following outstanding claims: Plaintiff's cybersquatting and accounting claims; and Defendants Paul Sandford, Nick Sandford, and Grumpy Beverage LLC's (collectively, "Defendants") counterclaims seeking declaratory relief for ownership of trademark, copyright, and domain name; and declaratory relief for non-infringement of trademark and copyright. Final Pretrial Conference Order at 2.[1]

On January 10, 2018, Defendants filed proposed findings of fact and conclusions of law on their counterclaims for declaratory judgment of copyright and trademark non-infringement. Defendants' Proposed Findings of Fact and Conclusions of Law ("Def. FFCL") (Dkt 119). On January 10, 2018, Plaintiff filed proposed findings of fact and conclusions of law requesting that the Court deny Defendants' counterclaims for declaratory judgment of copyright and

---

[1] At the final pretrial conference, the Court explained that the parties could rely on the evidence admitted at jury trial for their claims to be decided by the Court, and that if the parties wanted to submit additional evidence for their Court-tried claims, the Court would hear testimony in the evenings during trial.

trademark non-infringement, and grant Plaintiff's claim for cybersquatting and accounting. Plaintiff's Proposed Findings of Fact and Conclusions of Law ("Pl. FFCL") (Dkt 118-1).

On January 24, 2018, the Court set a post-trial briefing schedule for amended proposed findings of facts and conclusions of law, based on the evidence admitted at jury trial. *See* Order Setting Briefing Schedule (Dkt. 133).

On January 31, 2018, Defendants filed Amended Proposed Findings of Fact and Conclusions of Law regarding their counterclaim for declaratory relief for non-infringement of trademark and copyright ("Declaratory Br.") (Dkt. 138).[2] On February 7, 2018, Plaintiff filed Amended Proposed Findings of Fact and Conclusions of Law in opposition to the counterclaim for declaratory relief for non-infringement of trademark and copyright ("Declaratory Opp'n") (Dkt. 139).

On January 31, 2018, Plaintiff filed Amended Proposed Findings of Fact and Conclusions of Law regarding its cybersquatting claim ("Cybersquatting Br.") (Dkt. 137).[3] On February 7, 2018, Defendants filed Amended Proposed Findings of Fact and Conclusions of Law in opposition to the cybersquatting claim ("Cybersquatting Opp'n") (Dkt 137).

The Court issues the following findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52. To the extent that any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact, and to the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

---

[2] Grumpy Beverage waives its counterclaim for declaratory relief for ownership of trademark, copyright, and domain name. *See* Defendants' Proposed Judgment (Dkt. 142-1) at 1. Grumpy Beverage also argues that because Plaintiff did not seek leave to amend the complaint at any time up through to the commencement of trial, once Grumpy Beverage intervened as a Defendant, and because Plaintiff did not move to amend the pleadings to conform to evidence following the conclusion of the trial, Grumpy Beverage cannot be liable for infringement. *See* Declaratory Br. at 1. However, the Court already decided at the Final Pretrial Conference that Grumpy Beverage is bound by the Complaint as a defendant-intervenor. Declaratory Opp'n Br. at 2 (citing *United States v. State of Or.*, 657 F.2d 1009, 1014 (9th Cir. 1981)) (explaining that intervenors "enter the suit with the status of original parties and are fully bound by all future court orders")).

[3] Plaintiff states the following regarding its accounting claim:
> In light of the jury's award of statutory copyright and trademark damages and nominal contract damages in Plaintiff's favor, Plaintiff has no need to determine its lost profit damages at this time, and therefore its Accounting claim is no longer ripe. However, in the event that one or more of the jury's damage awards are impacted and/or modified by the Court and/or on appeal, Plaintiff reserves its right to pursue its Accounting claim at that time.

Cybersquatting Br. at 1.

## II. FINDINGS OF FACT

### A. Declaratory Relief For Non-Infringement

1. Grumpy Cat is a viral Internet meme that transformed a house cat named Tardar Sauce into one of the most famous cats in the world. *See* Trial Testimony of Tabatha Bundesen; *see also* Declaratory Br. ¶ I.1 (citing Compl. ¶ 13).

2. Plaintiff is the owner of the intellectual property rights associated with Grumpy Cat, including a registered trademark and four registered copyrights. *See* Trial Testimony of Kia Kamran; *see also* Declaratory Br. ¶ I.2 (citing Compl. ¶¶ 14, 15, 16).

3. On or around May 31, 2013, Plaintiff, the owner of Grumpy Cat's intellectual property, entered into a license agreement with Defendant Grenade Beverage that granted Grenade certain exclusive rights to use Grumpy Cat's copyrighted and trademarked name and image. *See* Trial Testimony of Kia Kamran and Paul Sandford; Def. FFCL No. I.3; Declaratory Br. No. I.8; Declaration of Brian Kindler ("Kindler Decl.") (Dkt. 88-2), Ex. 1 ("License Agreement") (admitted at trial, *see* Exhibits Admitted (Dkt. 129) at 1)).[4]

4. The License Agreement granted Grenade a "license and privilege" for the use of the Licensed Properties "in connection with the manufacture, advertisement, merchandising, promotion, distribution, and sale of solely Products . . . ." License Agreement ¶ 2(a).

5. The License Agreement defines "Products" as "a line of Grumpy Cat-branded coffee products, or other additional products within the Product Category that may, upon the Parties' mutual approval, be marketed hereunder." *Id.* ¶ 1(b).

6. The License Agreement defines "Product Category" as "non-alcoholic beverages." *Id.* ¶ 1(a).

7. The Grant of Rights of the License Agreement states:

> Licensor hereby grants to Licensee, and Licensee hereby accepts from Licensor, the exclusive, non-assignable, non-sublicensable (except as set forth in Paragraphs 6[c] and 13 below), non-transferable right, license and privilege, solely during the Term,

---

[4] The entire License Agreement is incorporated herein by reference.

-4-

>solely in the Product Category of utilizing Licensor's Licensed Properties in connection with the manufacture, advertisement, merchandising, promotion, distribution, and sale of solely Products, in any and all media and forms of communication and through all channels of trade and distribution throughout the Contract Territory [the Universe] during the Term defined in Paragraph 3 below [five year terms that automatically renew.

*Id.* ¶¶ 1(b), 2(a), 3.

8. The Ownership section states:

>All right, title and interest in and to all copyrights and trademarks in and to the Licensed Properties shall at all times be owned by, and remain the property of, exclusively Licensor, and Licensee covenants and agrees that this Agreement shall be deemed a license, not a transfer, of Licensor's rights in the Licensed Properties. All Works created hereunder by Licensee or any of its agents and/or employees embodying the Licensed Properties, including any adaptations thereof or derivations therefrom (which shall at all times be made solely with the prior written consent of Licensor) and the right to copyright and/or trademark therein, shall from the inception of its creation, be the sole and exclusive property of Licensor throughout the Territory in perpetuity within the meaning of the Copyright and Trademark Laws throughout the world, free of any claim whatsoever by Licensee or by any persons deriving any rights or interests therefrom . . . .

*Id.* ¶ 4(b).

9. Defendants used the Grumpy Cat name and image to market iced coffee and non-iced coffee products, including ground coffee. *See* Declaratory Br. ¶ 37; *see, e.g.*, Trial Testimony of Kia Kamran, Paul Sandford.

### B. Cybersquatting

10. A third party owned the domain www.grumpycat.com prior to Grumpy Cat being born, and before Grumpy Cat went viral on the internet. *See* Trial Testimony of Kia Kamran.

11. Plaintiff's intellectual property counsel, Kia Kamran, understood the third party to have a seniority interest in the domain, compared to Plaintiff's trademark interest in the domain. *See id.*

12. Plaintiff was unable to obtain the domain from the third party. *See id.*

13. At some point, Paul Sandford and/or Grumpy Beverage obtained the domain name from the third party prior owner, after Mr. Kamran could not obtain the domain name from the third party prior owner. *See id.*

14. In October 2014, Paul Sandford and Grumpy Beverage, through their counsel, Brian Kinder, proposed that—in exchange for Paul Sandford and Grumpy Beverage transferring www.grumpycat.com to Plaintiff—the license agreement be changed: (1) to apply to "Grumpy-Cat branded coffee products," rather than "a line of Grumpy-Cat branded coffee products"; and (2) to add language requiring that approval of products "shall not be unreasonably withheld." *See* Trial Testimony of Kia Kamran and Paul Sandford; *see also* Cybersquatting Br. at 2.

15. Plaintiff declined the proposal regarding the transfer of www.grumpycat.com and a proposed modification to the License Agreement. *See* Trial Testimony of Kia Kamran.

16. At some point, Grumpy Beverage used www.grumpycat.com to redirect traffic to Grumpy Beverage coffee products. *See id.*

## II.   CONCLUSIONS OF LAW

### A. Declaratory Relief for Non-Infringement

17. Defendants argue that: (1) as an exclusive licensee, Grumpy Beverage cannot be sued for infringement because it owns the intellectual properties; and (2) even if Grumpy Beverage were a non-exclusive licensee, Plaintiff can only sue Grumpy Beverage for breach of contract and in any case cannot meet its burden of proof for its infringement claim. Declaratory Br. at 13–23.

18.     In response, Plaintiff argues that: (1) by using Plaintiff's copyrights and trademarks on a ground coffee product that fell outside the scope of the License Agreement, Defendants necessarily committed infringement; and (2) Plaintiff did not transfer its intellectual property to Grumpy Beverage. Declaratory Opp'n at 9–11.

19.     "The enforcement of a copyright license raises issues that lie at the intersection of copyright and contract law." *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1121 (9th Cir. 1999), *implied overruling on other grounds recognized by Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 979 (9th Cir. 2011).

20.     "When a licensee exceeds the scope of the license granted by the copyright holder, the licensee is liable for infringement." *LGS Architects, Inc. v. Concordia Homes of Nevada*, 434 F.3d 1150, 1156 (9th Cir. 2006).

21.     An exclusive licensee "cannot be liable for infringing the copyright rights conveyed to it" under an exclusive license. *United States Naval Inst. v. Charter Communs., Inc.*, 936 F.2d 692, 695 (2nd Cir. 1991). Conversely, it logically follows that an exclusive licensee *can* be liable for infringing copyrights *not* conveyed to it under the exclusive license. *Cf. id.*

22.     If "a license is limited in scope and the licensee acts outside the scope, the licensor can bring an action for copyright infringement." *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d at 1121; *see also Ninth Circuit Manual of Model Jury Instructions*: Civil § 17.13 (2017) (Comments) (citing *Sun Microsystems*, 188 F.3d at 1121, for the same proposition); *Hardy Life, LLC v. Nervous Tattoo, Inc.*, No. CV 08-3524 PA (CTX), 2008 WL 11338698, at *4 (C.D. Cal. Aug. 4, 2008) (applying the rule from *Sun Microsystems*—as to when a copyright infringement claim can be brought despite the existence of a copyright license—to when trademark infringement can be brought despite a trademark license).

23.     When a party breaches a contractual term that limits the scope of a license, called a "condition," that party can be liable for infringement. *Sun Microsystems*, 188 F.3d at 1120; *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 939 (9th Cir. 2010), *as amended on denial of reh'g* (Feb. 17, 2011), *opinion amended and superseded on denial of reh'g*, No. 09-15932, 2011 WL 538748 (9th Cir. Feb. 17, 2011). However, when a party breaches other

1 contractual terms, called "covenants," that party cannot be liable for infringement. *Sun Microsystems*, 188 F.3d at 1120.

24. When interpreting the terms and scope of a licensing agreement, courts apply general principles of contract interpretation. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 989 (9th Cir. 2006). Issues of contract construction are generally for the court to decide as a matter of law. *Fireman's Fund Ins. Co. v. City of Lodi, California*, 302 F.3d 928, 951, n.21 (9th Cir. 2002).

25. Accordingly, to establish infringement, Plaintiff must demonstrate that the term from the License Agreement that Defendants violated is a condition, and not a covenant. *See MDY Indus., LLC*, 629 F.3d at 939; *cf. Netbula, LLC v. BindView Dev. Corp.*, 516 F. Supp. 2d 1137, 1151 (N.D. Cal. 2007) ("Where, the existence of a license is not in dispute, and only the scope of the license is at issue, the copyright owner bears the burden of proving that the defendant's copying was unauthorized.").

26. When deciding whether a contractual term is a covenant or a condition, courts apply state contract law, to the extent consistent with federal law and policy. *MDY Indus., LLC*, 629 F.3d at 939. Courts first construe the term according to state law and then evaluate whether that construction is consistent with federal intellectual property law and policy. *Id.*

27. The License Agreement lacks a choice of law provision. *See* License Agreement. Throughout this litigation, that parties have agreed that California law applies in interpreting the License Agreement, and the Court has applied California law in interpreting the License Agreement. *See, e.g.*, Briefing (Dkts. 57–59); and Order Dismissing in Part Counterclaims (Dkt. 63) (citing California contract law to interpret the License Agreement); Briefing and Summary Judgment Order (Dkts. 88–90, 92) (same).

28. Under California law, "a covenant is a promise to do or refrain from doing a specific act. A condition is a qualification to the parties' obligations; if it occurs, the interest is terminated or enlarged." *Etemadi v. Metro. Fashion Week, LLC*, No. CV 17-1549 PA (GJSX), 2017 WL 5592901, at *3 (C.D. Cal. June 21, 2017) (quoting *San Mateo Cmty. Coll. Dist. v. Half Moon Bay Ltd. P'ship*, 65 Cal. App. 4th 401, 411 (1998)).

29. Under California law, to determine whether a term is a condition or a covenant the Court must review the entire License Agreement and "effect the mutual intention of the parties 'as gathered from the four corners of the instrument.'" *Sun Microsystems, Inc. v. Microsoft Corp.*, 81 F. Supp. 2d 1026, 1031–32 (N.D. Cal. 2000) (citing *Machado v. Southern Pacific Transportation Co.*, 233 Cal. App. 3d 347, 352 (1991); *Brobeck v. Telex*, 602 F.2d 866, 871–72 (9th Cir. 1979); Cal. Civ. Code § 1641 ("[T]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.")).

30. Defendants argue that a court will not imply that a covenant is a condition unless the parties use clear and unambiguous language, and wherever possible, equity construes ambiguous contract provisions as covenants rather than conditions. Declaratory Br. at 17 (citing *Standard Oil Co. of Cal. v. Perkins*, 347 F.2d 379, 383 (9th Cir. 1965); *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 939 (9th Cir. 2010)). However Defendants' cited cases were applying Delaware and Oregon law. *See Perkins*, 347 F.2d at 383 (applying Oregon law); *MDY Indus.*, 629 F.3d at 939 (applying Delaware law). Defendants also cite three California court opinions from the 1950s that suggest that where it is doubtful, courts should interpret words as creating a covenant. Declaratory Br. at 22 (citing *Pacific Allied v. Century Steel Products*, 162 Cal. App. 2d 70, 80 (1958); *Division of Labor Law Enforcement, Dep't of Industrial Relations v. Ryan Aeronautical Co.*, 106 Cal. App. 2d Supp. 833, 836 (1951); *Alpha Beta Food Mkt. v. Retail Clerks*, 45 Cal. 2d 764, 771 (1955), *cert. denied*, 350 U.S. 996 (1956)). However, recent decisions make clear that under California law, when deciding whether words are a covenant or condition, courts should "effect the mutual intention of the parties 'as gathered from the four corners of the instrument.'" *See Sun Microsystems, Inc. v. Microsoft Corp.*, 81 F. Supp. 2d 1026, 1031–32 (N.D. Cal. 2000) (citing *Machado v. Southern Pacific Transportation Co.*, 233 Cal.App.3d 347, 352 (1991)).

31. Plaintiff alleges that Defendants' use of Grumpy Cat's trademarked and copyrighted name and likeness for the sale of coffee products other than iced coffee exceeds the scope of the license in the License Agreement. *See generally* MSJ Order; PL. FFCL No. II.1.

32. The license in the License Agreement granted:

> the exclusive, non-assignable, non-sublicensable (except as set forth in Paragraphs 6[c] and 13 below), non-transferable right, license and privilege, solely during the Term, solely in the Product Category of utilizing Licensor's Licensed Properties in connection with the manufacture, advertisement, merchandising, promotion, distribution, and sale of solely Products, in any and all media and forms of communication and through all channels of trade and distribution throughout the Contract Territory [the Universe] during the Term defined in Paragraph 3 below [five year terms that automatically renew].

*Id.* ¶¶ 1(b), 2(a), 3.

33. Plaintiff asserts that Defendants violated the License Agreement because "a line of Grumpy-Cat branded coffee products" only included iced coffee, and "additional products," required Plaintiff's approval, which Defendants never received for additional coffee products beyond iced coffee. *See* MSJ Order at 10–16; Plaintiff's Memorandum of Contentions of Fact and Law (Dkt. 93) at 2.

34. At summary judgment, this Court held that there was a genuine dispute of material fact as to the intent of the parties in pre-approving "a line of Grumpy Cat-branded coffee products" in the License Agreement. Specifically, the Court held that because it was ambiguous whether a "line of . . . coffee products" includes or excludes coffee products other than iced coffee, and because the parties put forth conflicting extrinsic evidence, ascertaining the intent of the parties regarding this term was a question of fact for the jury. MSJ Order at 14.

35. At trial, the jury found that Paul Sandford and Grumpy Beverage infringed Plaintiff's copyrights and trademarks, which necessarily required the jury to find that the scope of "a line of Grumpy Cat-branded coffee products" in the License Agreement was limited to iced coffee. *See* Declaratory Opp'n at 9; Redacted Jury Verdict Form.

36. Accordingly, Defendants' sale of coffee products other than iced coffee is beyond the scope of the pre-approved exclusive license for a "line of Grumpy Cat-branded coffee products."

37. Nonetheless, the question now before the Court is whether the subsequent term in the License Agreement—"additional products within the Product Category [non-alcoholic beverages] that may, upon the Parties' mutual approval, be marketed hereunder"—is a covenant or a condition. *See Etemadi v. Metro. Fashion Week, LLC*, No. CV 17-1549 PA (GJSX), 2017 WL 5592901, at *3 (C.D. Cal. June 21, 2017) (quoting *San Mateo Cmty. Coll. Dist. v. Half Moon Bay Ltd. P'ship*, 65 Cal. App. 4th 401, 411 (1998)).

38. If this "additional products" term is a covenant—in other words it granted Defendants an exclusive license to sell non-alcoholic beverage products with a promise to receive approval before selling them—then Defendants legally cannot be liable for infringement (even though they could be liable for breach of contract for failing to receive approval for coffee products other than iced coffee). *See Sun Microsystems*, 188 F.3d at 1120. If, however, the "additional products" term is a condition—in other words a limitation that excludes additional non-alcoholic beverages from the exclusive license until such products are approved—then Defendants may legally be found liable for infringement for exceeding the scope of the License Agreement by selling unapproved non-alcoholic beverages. *See id.*

39. To determine whether the "additional products" term is a covenant or a condition, the Court must review the entire License Agreement, and determine "the mutual intention of the parties 'as gathered from the four corners of the instrument.'" *See Sun Microsystems*, 81 F. Supp. 2d at 1031–32; *Fireman's Fund*, 302 F.3d at 951, n.21.

40. The introduction to the License Agreement states that the parties enter into the agreement for the purposes of exploiting "a line of Grumpy Cat-branded coffee products" (which the jury determined was limited to iced coffee):

> GRUMPY CAT LIMITED (hereinafter referred to as "Licensor"), is an Ohio Limited Liability entity and owns and controls all copyrights, trademarks, and other intellectual property rights in and

> to "Grumpy Cat". GRENADE BEVERAGE LLC (the "Licensee") is a beverage brand development, manufacturing, marketing, and distribution company, wishing to market and sell a line of Grumpy Cat-branded coffee products. Licensor and Licensee (each a "Party" and collectively the "Parties") have therefore agreed to enter into this licensing agreement (the "Agreement") together for the purposes of exploiting such products.

License Agreement at 1.

41. The License Agreement grants rights to use the licensed property "in" the Product Category [non-alcoholic beverages], rather than rights "to" the Product Category. *Id.* ¶ 2 (a).

42. The language of the Agreement suggests that the license was granted solely for iced coffee, rather than for all non-alcoholic beverages, and that "other additional products within the Product Category that may, upon the Parties' mutual approval, be marketed hereunder," would only become part of the intellectual property license upon approval. *See id.* ¶ 1(b).

43. A review of the four corners of the License Agreement makes clear that the parties intended that the "additional products" term is a condition that excludes additional products from the license, absent mutual approval—rather than a grant of an exclusive license "to" all non-alcoholic products. *See id.* ¶ 2 (a) (granting rights to use the licensed property "in" the Product Category [non-alcoholic beverages], rather than rights "to" the Product Category).

44. Thus, the License Agreement does not support an interpretation of the "additional products" term as a covenant, such that the parties intended that Plaintiff would grant a license to Grumpy Cat's name and likeness for all non-alcoholic products, subject to a promise to seek mutual approval for each additional product.

45. The Court is not aware of any authority or argument suggesting that interpreting the License Agreement's "additional products" term as a condition would be inconsistent with federal law or policy, and the parties did not address the issue.

46. Because the License Agreement's pre-approval of (and exclusive license for) a "line of Grumpy Cat-branded coffee products" only included iced coffee, and because the "additional products" term is a condition, the jury could find, as it did, that Defendants—in selling coffee other than iced coffee—exceeded the scope of the exclusive license and legally may be found liable for copyright and trademark infringement. *See Sun Microsystems*, 188 F.3d at 1120.

47. Therefore, Defendants are not entitled to declaratory relief of non-infringement of copyright and trademark.

**B. Cybersquatting**

48. To prevail on a cybersquatting claim, a plaintiff must prove the following elements:

>(1) the defendant registered, trafficked in, or used a domain name;
>
>(2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and
>
>(3) the defendant acted "with bad faith intent to profit from that mark."

*DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218–19 (9th Cir. 2010) (quoting 15 U.S.C. § 1125(d)(1)).

49. "Bad faith intent . . . shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).

50. The statute sets forth a non-exhaustive list of factors that a court may consider in determining whether a person has bad faith intent:

>(I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
>(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

15 U.S.C. § 1125(d)(1)(B)(i).

51. A jury can lawfully find that using a domain name "to get leverage in a business dispute can establish 'bad faith intent.'" *Nahum*, 624 F.3d at 1219–20.

52. A bad faith determination "implicates three analyses:

> (1) surveying the nine non-exclusive and permissive statutory factors that may be considered in determining whether a person has a bad faith intent;
>
> (2) taking into account the unique circumstances of each case, which represent the most important grounds for finding bad faith, and which affect the examination (and weight) of the nine permissive factors as well as any other relevant considerations; and
>
> (3) considering the availability of the safe harbor for any defendant who believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful.

*Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1220 (9th Cir. 2012) (citations and internal quotation marks omitted).

53. Plaintiff argues that Paul Sandford and Grumpy Beverage—by having their counsel, Brian Kinder, propose that the scope of the license agreement be expanded to apply to more than just 'a line of' iced coffee products in exchange for transferring www.grumpycat.com to Plaintiff—acted in bad faith by using the domain as leverage. Cybersquatting Br. at 2. Plaintiff also argues that Paul Sandford and Grumpy Beverage—by using the domain to direct and divert consumers to a website selling "Grumpy Cat" ground coffee product—confused customers into believing that Plaintiff had authorized, sponsored, or is somehow affiliated with the unauthorized sale of ground coffee. *Id.* at 3.

54. Defendants argue that Grumpy Beverage, LLC did not register the domain, but entered into an agreement to acquire it on that condition that Grumpy Beverage LLC—which Defendants assert Plaintiff is a 10% owner of under the License Agreement, s*ee* License Agreement ¶ 6(d)—pay the owner $50,000. Cybersquatting Opp'n Br. at 15–16. Defendants

1  argue that Grumpy Beverage, as an exclusive licensee, partially owned by Plaintiff, had a good
2  faith belief that it was lawful to enter the domain name agreement. *Id.*

3        55.    As to the non-exclusive and permissive statutory factors for bad faith intent,
4  Plaintiff suggests that Paul Sandford and Grumpy Beverage had intent to divert consumers from
5  the mark owner's online location to a site accessible under the domain name that could harm the
6  goodwill represented by the mark, by redirecting the website to Grumpy Beverage to show
7  ground coffee products. *See* 15 U.S.C. § 1125(d)(1)(B)(i)(V). However, considering the unique
8  circumstances of this case, which are the most important grounds for finding bad faith, *Rearden*,
9  683 F.3d at 1220, at that time, Defendants likely had reasonable grounds to believe the use of
10 the website was lawful because the parties had a License Agreement for a line of Grumpy-Cat
11 branded coffee products (even though, ultimately, the ground coffee exceed its scope).

12       56.    Next, Plaintiff argues that Paul Sandford and Grumpy Beverage acted in bad faith
13 by proposing that the scope of the license agreement be expanded in exchange for turning over
14 www.grumpycat.com to Plaintiff. Cybersquatting Br. at 2.

15       57.    In *Nahum*, the Ninth Circuit held that a jury can lawfully find that using a domain
16 name "to get leverage in a business dispute can establish 'bad faith intent.'" *Nahum*, 624 F.3d at
17 1219–20. To reach that conclusion, the court reasoned that one statutory "factor notes that it is
18 'indicative' of a 'bad faith intent to profit' from the mark if the person offering to transfer the
19 domain name to the owner of the mark has never actually used or intended to use the domain
20 name for bona fide sales of goods." *Id.* That factor, the court concluded, "may fairly be read to
21 mean that it is bad faith to hold a domain name for ransom, where the holder uses it to get
22 money from the owner of the trademark rather than to sell goods." *Id.*

23       58.    Here, the circumstances do not suggest that the website was used as leverage for
24 ransom to get money. Rather it was used to sell goods, as part of business negotiation between
25 business collaborators to further the sale of "Grumpy Cat"-branded products, via a proposal to
26 modify the license agreement to cover "Grumpy-Cat branded coffee products," rather than "a
27 line of Grumpy-Cat branded coffee products," and to add language requiring that approval of
28

products "shall not be unreasonably withheld." *See* Trial Testimony of Kia Kamran and Paul Sandford.

59. Thus, Plaintiff has not shown by a preponderance of the evidence that Paul Sandford and Grumpy Beverage acted in bad faith and lacked reasonable grounds to believe that the use of the domain name was lawful at the time of use.

60. Because the Court finds that Plaintiff did not prove the third element of cybersquatting—that Defendants acted with bad faith—the Court need not decide the first element, namely whether Defendants "registered, trafficked in, or used" the domain name, which the parties dispute. *See Nahum*, 624 F.3d at 1218–19. Nonetheless, as to the first element, Plaintiff attaches Trial Exhibit 101 (purportedly a domain registration listing for www.grumpycat.com) to its Cybersquatting Brief, but Plaintiff did not seek to admit this evidence into the record at jury trial (or during the evenings or otherwise before the Court sitting as a fact-finder), which is another ground on which the Court finds that Plaintiff has not established cybersquatting by a preponderance of the evidence. *See* Cybersquatting Br. at 1; Cybersquatting Opp'n at 3.

61. In addition, as to the second element, it is obvious that www.GrumpyCat.com is identical or confusingly similar to Plaintiff's "Grumpy Cat" mark. *See Nahum*, 624 F.3d at 1218–19.

## IV. <u>CONCLUSION</u>

62. For the reasons explained above, the Court HOLDS that Plaintiff does not prevail on its cybersquatting claim and Defendants are not entitled to declaratory relief of copyright and trademark non-infringement.

DATED: May 31, 2018

*David O. Carter*

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE